[Cite as *In re B.T.H.*, 2017-Ohio-8358.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: B.T.H. | : | |
| | | CASE NO. CA2017-06-080 |
| | : | |
| | | O P I N I O N |
| | : | 10/30/2017 |
| | : | |


APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2014-0278


Amy R. Ashcraft, P.O. Box 172, Seven Mile, Ohio 45062, Guardian Ad Litem

Debra R. Rothstein, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, for B.T.H.

Mark W. Raines, 246 High Street, Hamilton, Ohio 45011, for appellant

Carol A. Garner, 9435 Waterstone Boulevard, Suite 140, Cincinnati, Ohio 45249, Guardian Ad Litem for appellant

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for Butler County Children Services


**M. POWELL, J.**

{¶ 1} Appellant, the biological mother of B.T.H. ("Mother"), appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of B.T.H. to appellee, the Butler County Department of Job and Family Services ("JFS" or "the agency").

{¶ 2} In July 2014, JFS filed a complaint alleging that B.T.H. was a neglected, abused, and dependent child. The complaint alleged that Mother was living with B.T.H., age 10, in an unsanitary motel room. The complaint further alleged that Mother had mental health issues and an extensive history with the agency. Finally, the complaint alleged that Mother asked B.T.H. to "have sex" with a boy who was living at the motel.

{¶ 3} JFS' complaint requested an ex parte emergency order granting temporary custody of B.T.H. to her aunt or to JFS. The juvenile court found probable cause to believe that B.T.H.'s removal was necessary to prevent immediate or threatened physical or emotional harm. Based on this finding, the court issued an ex parte emergency order, which placed B.T.H. in the temporary custody of the aunt.

{¶ 4} In August 2014, JFS entered into a case plan with Mother with the goal of reunification. The case plan required Mother to complete a psychological evaluation to determine her mental health needs and follow any recommendations, comply with court orders, address her anger issues, follow through with her current mental health services, take her medications as prescribed, and secure stable housing and income. The case plan permitted Mother weekly supervised visits with B.T.H.

{¶ 5} In September 2014, the juvenile court found that B.T.H. was an abused and dependent child and that Mother was the perpetrator of the abuse. The court noted that B.T.H.'s father, after proper service, failed to appear and was found in default.

{¶ 6} In May 2015, B.T.H.'s aunt informed the agency that she could no longer maintain temporary custody of B.T.H. JFS then moved to transfer temporary custody to the agency. The court granted JFS' motion and the agency placed B.T.H. in foster care.

{¶ 7} In March 2016, JFS moved for permanent custody. The motion alleged that B.T.H. could not be placed with her parents within a reasonable time and should not be placed with her parents and that a grant of permanent custody in favor of the agency was in

B.T.H.'s best interest. In July 2016, JFS filed a second motion for permanent custody with allegations identical in all pertinent respects to the allegations of the March 2016 motion. At a later hearing, the agency formally withdrew the March 2016 permanent custody motion.

{¶ 8} The court held the permanent custody hearing over several days in November 2016 and January 2017. In support of permanent custody, JFS introduced the testimony of Mother's JFS caseworker, who had been involved with the case since July 2014.

{¶ 9} The caseworker testified that Mother had problems with taking her prescription medication. The caseworker testified that she checked Mother's prescriptions on three occasions and found that Mother was out of medication sooner than called for by the prescriptions. Yet Mother tested negative for her medication in drug screens. Mother always provided the caseworker with excuses for the loss of medication, including claiming that family members were stealing her prescriptions. The agency referred Mother to a substance abuse agency that would assist Mother with taking her medication and perform pill counts.

{¶ 10} A counselor from the substance abuse agency testified that she began working with Mother in October 2015. The counselor provided Mother with scheduled in-home therapy sessions, which also involved pill counts. Mother's counselor stated that on several of these scheduled visits no one responded to the door. Mother offered various excuses as to her lack of response. When the counselor could complete pill counts, Mother's counts were sometimes substantially off. On one occasion, Mother was missing 40 Xanax pills only two days after receiving her prescription. The counselor also noted that Mother tested negative for her prescribed medication. Finally, the counselor said that Mother showed her a text message from a friend asking for Mother's medication.

{¶ 11} The JFS caseworker testified that Mother lived with relatives until April 2015, when she obtained an apartment. The caseworker visited Mother's apartment and found it unsanitary. The caseworker observed food left out in the kitchen, garbage on the floor, and a

strong odor and dirty dishes on Mother's mattress. The caseworker never observed the apartment in an appropriate condition for a child. Mother's counselor similarly testified that Mother's apartment was "always dirty."

{¶ 12} The agency also had concerns about Mother's personal associations. Mother admitted to the caseworker that her cousin had overdosed in the apartment and that others she allowed in the home were stealing her medication. The caseworker confirmed that Mother filed a police report concerning missing pills. While the permanent custody hearing was pending, Mother was in the process of being evicted from her apartment for failure to pay late payment fees.

{¶ 13} The caseworker agreed that the agency's primary concern was Mother's mental health and that Mother had consistently utilized mental health services. However, Mother continued to exhibit disturbing behavior. Once, Mother contacted the agency and reported that B.T.H. severely injured herself in a bicycle accident, was hospitalized, and then disappeared from the hospital. In fact, B.T.H. was safe at school. Mother later contacted the agency and reported that she dreamed the incident.

{¶ 14} A specialist at a family visitation center testified that Mother regularly visited with B.T.H. The specialist observed a bond between Mother and B.T.H. However, Mother's visits were supervised at the highest level of scrutiny throughout the case. The agency deemed this level of supervision necessary because the specialist had to re-direct Mother from discussing inappropriate topics with B.T.H., such as the court case or B.T.H.'s foster placement. Mother would also interrupt B.T.H. so that Mother could discuss her own concerns. The specialist, not Mother, had to provide structure to the visits. The specialist observed Mother and B.T.H. play basketball and was concerned that Mother behaved aggressively towards her daughter while playing.

{¶ 15} The specialist also observed Mother acting oddly. Mother began telling

visitation employees that she was pregnant. However, Mother's varying statements as to the stage of the pregnancy aroused suspicion. Mother later told facility employees that the pregnancy ended in miscarriage. During one visit, Mother also told B.T.H. that she had a "baby doll" and promised B.T.H. that she would bring it to a visit. However, Mother later told B.T.H. that the baby doll was too expensive, so she had to return it. Visitation employees had to cancel a visit after Mother's behavior indicated she was impaired.

{¶ 16} B.T.H.'s foster mother testified. The foster mother and her family lived near B.T.H. and Mother approximately six years earlier. At that time, B.T.H. was a frequent guest at their house. After B.T.H.'s removal, the foster mother saw B.T.H. at a school event and arranged to foster B.T.H. while the case proceeded. The foster mother said that B.T.H. had her own room and was bonded with her family. The foster mother was willing to adopt B.T.H. The caseworker testified that B.T.H. repeatedly indicated to the agency that she wanted to be adopted.

{¶ 17} Mother testified that her mental health was currently "like a rollercoaster. It's up and down." She was "a little bit" better than when the case began. Mother denied that she told visitation employees that she was pregnant. Mother also denied that her pill counts were inaccurate and blamed the counselor's miscalculation. Mother said that she was in the process of moving into a new one bedroom apartment where the conditions were better. Mother blamed the unsanitary conditions at the old apartment on the dilapidated state of the apartment itself, and said the landlord would not make repairs. Mother testified that she received around $700 per month in social security income and would receive more if she regained custody of B.T.H.

{¶ 18} A social worker with Mother's mental health agency testified that he had been assisting Mother with her daily needs, including transporting her once or twice a month to food pantries when she would prematurely use all of her food stamps. The social worker

observed improvements in Mother's ability to cope with anxiety, by using techniques that she had learned from him and others. The social worker said he would not be concerned if Mother regained custody of B.T.H. The social worker observed Mother's new apartment and agreed that Mother was maintaining it better than the old apartment. In this respect, the agency stipulated that they had no concerns with the condition of Mother's new apartment.

{¶ 19} With respect to B.T.H.'s father, the JFS caseworker testified that the agency was able to locate him in November 2015. B.T.H.'s father had no contact with B.T.H. between her removal and when the agency located him. B.T.H.'s father then exercised a few visits but the agency terminated the visits because B.T.H.'s father would not communicate with the agency. The record reflects that the agency served B.T.H.'s father with notice of the permanent custody motion but he failed to participate.

{¶ 20} On the final hearing day, B.T.H.'s attorney filed a motion requesting liberalized parenting time between B.T.H. and Mother. Specifically, B.T.H. asked to spend unsupervised time with Mother at Mother's new apartment "to see whether she can live with her Mother." B.T.H. also asked the juvenile court to make no decision with respect to permanent custody until B.T.H. could determine if she wanted to live with Mother. Mother did not join in the motion or otherwise indicate her support for the motion. Finally, B.T.H. asked the court for an in-camera meeting with the magistrate hearing the case. The court denied B.T.H.'s motion with respect to liberalized parenting time but agreed to meet in camera with B.T.H. prior to issuing a decision.

{¶ 21} B.T.H.'s guardian ad litem ("GAL") filed a report recommending permanent custody be granted to the agency. The GAL also testified at the permanent custody hearing and was cross-examined on the report. The GAL testified that her recommendation would not change because B.T.H. had requested liberalized visits with Mother and Mother had improved the sanitary conditions of her living environment. Mother's more concerning mental

health issues remained unresolved.

{¶ 22} In February 2017, a juvenile court magistrate issued a decision recommending that the court grant permanent custody to the agency. The magistrate concluded that B.T.H.'s father abandoned B.T.H. The magistrate further concluded that B.T.H. was in the agency's temporary custody for 12 or more months of a consecutive 22-month period and that placing B.T.H. in the permanent custody of the agency was in the child's best interest. The court adopted the magistrate's decision after overruling Mother's objections. Mother now appeals the decision, raising two assignments of error.

{¶ 23} Assignment of Error No. 1:

{¶ 24} THE TRIAL COURT ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN IT IMPROPERLY DENIED MINOR CHILD'S MOTION FOR A CONTINUANCE TO EXPLORE HER INTEREST IN RETURNING HOME WITH HER MOTHER.

{¶ 25} Mother argues that the juvenile court abused its discretion when it denied B.T.H.'s motion for liberalized parenting time without appropriately weighing the child's need for a continuance against the prejudice to others. The state argues that Mother lacks standing to appeal the denial of B.T.H.'s motion. Alternatively, the state contends that the juvenile court did not abuse its discretion in denying the motion. Mother did not file a reply brief responding to the state's arguments on standing.

{¶ 26} Standing is a "party's right to make a legal claim or seek judicial enforcement of a duty or right." *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, ¶ 27, quoting Black's Law Dictionary (8th Ed.2004) 1442. Stated otherwise, only litigants with standing are entitled to have a court determine the merit of an issue presented. *Moore v. City of Middletown*, 133 Ohio St.3d 55, 2012-Ohio-3897, ¶ 20. Whether a party has standing is question of law that this court reviews de novo. *Id.*

{¶ 27} "'[T]he question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution."'" (Citations omitted.) *State ex rel. Dallman v. Franklin Cty. Court of Common Pleas*, 35 Ohio St.2d 176, 178-179 (1973), quoting *Sierra Club v. Morton*, 405 U.S. 727, 732, 92 S. Ct. 1361 (1972). "It is well-established that an appeal lies only on behalf of a party aggrieved by the final order appealed from." *Williams v. McFarland Properties, L.L.C.*, 177 Ohio App.3d 490, 2008-Ohio-3594, ¶ 29 (12th Dist.), citing *Midwest Fireworks Mfg. Co., Inc. v. Deerfield Twp. Bd. of Zoning Appeals*, 91 Ohio St.3d 174, 2001-Ohio-24. The party seeking to appeal bears the burden of establishing standing. *Id.*

{¶ 28} Mother failed to join in or otherwise demonstrate support for B.T.H.'s motion for liberalized parenting time. This court concludes that Mother did not establish a personal stake in the outcome of B.T.H.'s motion and therefore lacks standing to appeal the juvenile court's partial denial of the motion. *See, e.g., In re T.W.*, 1st Dist. Hamilton No. C-130080, 2013-Ohio-1754 (dismissing a father's appeal for lack of standing, which raised arguments on behalf of a great-grandmother). In addition, Mother did not respond to the state's standing challenge and has failed to meet her burden on appeal. *Williams* at ¶ 29. However, this court's decision would not change if Mother demonstrated standing.

{¶ 29} As this court will discuss in greater detail in response to Mother's second assignment of error, the juvenile court did not abuse its discretion in denying B.T.H.'s motion because Mother had yet to resolve the mental health issues that caused B.T.H.'s removal. Moreover, Mother only had supervised visitation with B.T.H., at a visitation center, during the 31-month pendency of this case. A sudden transition to unsupervised, in-home parenting time would not have been in B.T.H.'s best interest.

{¶ 30} The court also did not abuse its discretion in denying B.T.H.'s request to delay a

decision on the permanent custody motion. R.C. 2151.414(A)(2) provides that "[t]he court shall issue an order that grants, denies, or otherwise disposes of the motion for permanent custody, and journalize the order, not later than two hundred days after the agency files the motion." The agency filed its permanent custody motion on July 13, 2016. B.T.H. filed her motion on the final day of the custody hearing, i.e., January 25, 2017. Thus, 196 days elapsed since the filing of the permanent custody motion. Granting B.T.H.'s request would have significantly extended the juvenile court's resolution of the permanent custody motion beyond the statutory limit. Additional delay would also be contrary to the policy that juvenile custody issues be resolved expeditiously to allow the child to achieve permanence in a living arrangement. This court overrules Mother's first assignment of error.

{¶ 31} Assignment of Error No. 2:

{¶ 32} THE TRIAL COURT'S DECISION TO GRANT BUTLER COUNTY CHILDREN'S SERVICES PERMANENT CUSTODY IS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.

{¶ 33} Mother argues that the evidence does not clearly and convincingly support the conclusion that granting permanent custody to the agency was in B.T.H.'s best interest. Mother argues that the evidence showed a strong bond between Mother and B.T.H. and that Mother complied with the case plan's requirements to seek counseling for her mental health issues. While Mother concedes that the agency had some concerns, especially with respect to her prescription medication issues, she contends that these concerns did not outweigh Mother's progress in the case plan.

{¶ 34} Before a natural parent's constitutionally protected liberty interest in the care and custody of her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); R.C. 2151.414(B)(1). An

appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re J.H.*, 12th Dist. Clinton Nos. CA2015-07-014 and CA2015-07-015, 2016-Ohio-640, ¶ 21.

{¶ 35} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if the court makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e). Only one of those findings must be met to satisfy the second prong of the permanent custody test. *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 22.

{¶ 36} In this case, the juvenile court found by clear and convincing evidence that B.T.H. had been in JFS' temporary custody for 12 or more months of a consecutive 22-month period. Mother does not dispute this finding. Rather, Mother disputes that granting permanent custody of B.T.H. to the agency was in B.T.H.'s best interest.

{¶ 37} R.C. 2151.414(D)(1), provides:

> [T]he court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b)  The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)  The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d)  The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e)  Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 38} In granting JFS's motion for permanent custody, the juvenile court considered each of the best interest factors.  With respect to the first statutory factor, the juvenile court found that B.T.H.'s father had little contact with her during the case and that B.T.H. was not bonded with her father.  The court found that B.T.H. and Mother were bonded and that Mother had supervised visits with B.T.H. throughout the case.  The court noted that B.T.H. consistently indicated her desire to be adopted until the last day of the permanent custody hearing.  The court observed that B.T.H. was comfortable in her current home and was closely bonded to her foster family, who had expressed a willingness to adopt her.

{¶ 39} In consideration of the second statutory factor, the juvenile court indicated that B.T.H. expressed her wishes and concerns to the court in camera, which the court considered in rendering its decision.  The court also noted that it considered the report and recommendation of the GAL, who recommended permanent custody be granted to the agency.

{¶ 40} With respect to the third statutory factor, the juvenile court reviewed the child's custodial history and found that the court placed B.T.H. in the agency's temporary custody beginning in May 2015 and B.T.H. remained in JFS's custody through the remainder of the case.  The court also noted that the agency filed its permanent custody complaint on July 13,

2016, when B.T.H. had been in the agency's temporary custody for more than 12 months of a consecutive 22-month period.

{¶ 41} In considering the fourth statutory factor, the juvenile court found that B.T.H. needed a legally secure placement, which could not be achieved without a grant of permanent custody to the agency. In this regard, the juvenile court observed that B.T.H. had been out of her Mother's custody for 31 months while the case was pending. During that time, Mother had been referred for assistance for her issues with mental health and parenting. However, Mother failed to remedy the behaviors and concerns that caused B.T.H.'s removal. Finally, no relatives expressed any interest in taking custody of B.T.H.

{¶ 42} With respect to the fifth statutory factor, the juvenile court noted that B.T.H.'s father abandoned her.

{¶ 43} Based on these findings, the juvenile court found by clear and convincing evidence that it was in B.T.H.'s best interest to grant permanent custody to JFS. After a thorough review of the record, we find that the juvenile court's determination regarding the best interest of B.T.H. is supported by sufficient credible evidence.

{¶ 44} However, Mother argues that there was a lack of evidence submitted concerning how terminating her relationship with B.T.H. could affect B.T.H.'s well-being. Mother cites a case from the Ninth District Court of Appeals where the court reversed a grant of permanent custody. *In re A.W.*, 9th Dist. Lorain No. 09CA009631, 2010-Ohio-817. In *A.W.*, the court of appeals reversed after finding a "paucity" of evidence demonstrating that permanent custody was in the child's best interest. *Id.* at ¶ 12. The court observed that most evidence in the record weighed towards preserving the family relationship. *Id.* at ¶ 14. *A.W.* is distinguishable. Here there was substantial evidence in the record to support the conclusion that Mother's mental health problems, her issues with prescription medications, and her inability to maintain a sanitary home environment prevented Mother from providing

B.T.H. with a safe and stable permanent living arrangement. Although it is conceivable and understandable that B.T.H. could suffer some detriment by terminating the parental relationship with Mother, the evidence clearly and convincingly established that permanent custody in favor of the agency was the most appropriate disposition.

{¶ 45} Specifically, no dispositional alternative, other than permanent custody was legally or practically viable. An order extending temporary custody pursuant to R.C. 2151.415(A)(6) was not an available dispositional alternative, as R.C. 2151.415(D)(4) prohibits an extension of temporary custody beyond two years after the filing of the July 2014 complaint. An order for a planned permanent living arrangement pursuant to R.C. 2151.415(A)(5) was not an available dispositional alternative, as B.T.H. was not yet sixteen years old as required by R.C. 2151.415(C)(1). An order placing B.T.H. in the legal custody of a relative or other interested individual was not an available dispositional alternative as no such person filed a motion requesting legal custody or was identified in the complaint or a motion as a proposed legal custodian as provided by R.C. 2151.353(A)(3). Finally, orders that B.T.H. be returned to the custody of a parent or placed into the protective supervision of a parent pursuant to R.C. 2151.415(A)(1) and (2), respectively, were practically unavailable. Mother failed to remedy the conditions necessitating B.T.H.'s removal from Mother's custody and father had no relationship with B.T.H. and had abandoned her.

{¶ 46} Mother also argues that this case is comparable to one where this court reversed a decision granting permanent custody to a family services agency. *In re Knuckles*, 12th Dist. Butler Nos. CA2003-01-004 and CA2003-01-005, 2003-Ohio-4418. In *Knuckles* the lower court granted permanent custody largely because the parents failed to attend visits with their children and failed to complete case services. *Id.* at ¶ 21, 25. This court reversed, finding that the record revealed that the parents did not attend visits or complete case services because of transportation issues. *Id.* at ¶ 26. The record further reflected that the

agency failed to assist the parents with their transportation needs. *Id.* at ¶ 27. The visits the parents could attend demonstrated that the family was well-bonded. *Id.* at ¶ 23. In sum, we found that the record did not clearly and convincingly demonstrate that the parents could not provide their children with a legally secure placement. *Id.* at ¶ 33. In this case, however, the record established that Mother failed over a lengthy period to resolve many of the issues that led to B.T.H.'s removal and there was no indication that JFS failed to provide any necessary assistance to Mother to help her resolve those issues.

{¶ 47} The record reflects a bond between Mother and B.T.H. The record further reflects that Mother began to make some improvements in maintaining a sanitary living space, but not until after the agency filed for permanent custody. However, there are compelling reasons to weigh the best interest factors in favor of permanent custody to JFS. The agency's involvement with Mother spanned the entirety of B.T.H.'s life and included some 15 cases. The agency's primary concern was Mother's mental health. In the years while B.T.H. was out of Mother's custody, Mother did not substantially improve her mental health issues. This is reflected in the fact that Mother and B.T.H.'s visits were always held at the highest level of supervision, largely because of Mother's inappropriate behavior. Mother conceded that her mental state was "like a rollercoaster." Mother failed to resolve the agency's concerns with her prescribed medications. Mother also exhibited poor decision-making with respect to the persons who she allowed in her residence. B.T.H. needs permanency and cannot and should not wait until Mother is able to resolve her mental health issues. Accordingly, this court overrules Mother's second assignment of error.

{¶ 48} Judgment affirmed.

HENDRICKSON, P.J., and PIPER, J., concur.