[Cite as *In re M.H.*, 2022-Ohio-48.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY


IN RE:                             :

    M.H., et al.                  :         CASE NOS. CA2021-08-047
                                                      CA2021-08-048
                            :                  CA2021-08-049

                                             O P I N I O N
                                              1/10/2022


APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case Nos. 2017 JC 04951, 2017 JC 04952, and 2017 JC 05024


Mark J. Tekulve, Clermont County Prosecuting Attorney, and Nicholas Horton, Assistant Prosecuting Attorney, for appellee, Clermont County Children Services

CASA for Clermont Kids, and Nathan Bell, for appellee.

The Law Office of Wendy R. Calaway, Co., LPA, and Wendy R. Calaway, for appellant.


**HENDRICKSON, J.**

{¶1} Appellant, the biological mother ("Mother") of M.H., I.H., and D.H., appeals from a decision of the Clermont County Court of Common Pleas, Juvenile Division, granting permanent custody of her children to appellee, Clermont County Department of Job and Family Services ("CCDJFS"). The children's biological father ("Father") has filed a separate appeal and is not a party to the instant action. For the reasons outlined below, we affirm

the juvenile court's decision.

{¶2}    On March 22, 2017, CCDJFS filed a neglected child complaint and requested protective supervision of four-year-old M.H., born June 5, 2012, and three-year-old I.H., born July 2, 2013.  The complaint alleged that CCDJFS had been working voluntarily with the family since September 2016 due to the unsanitary and unsafe condition of their home.  CCDJFS reported that the family's trailer was infested with fleas, lice, and other bugs, and that the children had fleas and lice in their hair along with visible bite marks on their arms and legs.  CCDJFS also stated that the family was removed from their home for a brief period because it was soiled with dog, cat, and rabbit feces.  CCDJFS further alleged that the trailer had holes in the floor through which the ground was visible.

{¶3}    CCDJFS indicated that Mother and Father were able to clean their home and make it free from environmental hazards.  However, as CCDJFS alleged, Mother and Father soon regressed to the same issues of cleanliness.  This included allegations that the trailer was still infested with fleas.  CCDJFS alleged that an agency employee who visited the home found it cluttered and dirty, with feces on the ground.  During the same visit, the employee fell through a soft spot of the trailer's floor.  During another visit, the agency employee found smeared, dried dog feces in the children's bedroom.

{¶4}    CCDJFS stated that it had obtained vouchers for the family to repair their home and provided them with lot rent.  Mother and Father, however, were slow to engage with CCDJFS or to correct the safety problems with their home.  Despite adequate income, Mother and Father repeatedly struggled to pay bills due to their frivolous spending.  CCDJFS also alleged Mother had not engaged in mental health treatment.  CCDJFS noted, however, that the family had just recently started services with a parenting educator.

{¶5}    On April 27, 2017, the magistrate adjudicated M.H. and I.H. as neglected

children.  Following this adjudication, M.H. and I.H. remained in the custody of Mother and Father, but were subject to protective supervision by CCDJFS.  The juvenile court subsequently adopted the magistrate's recommendation on May 16, 2017.

{¶6}    Throughout the pendency of this case, CCDJFS implemented multiple case plans.  These plans included requirements that Mother and Father maintain a clean and safe living environment.  In addition, Mother and Father were required to receive parenting education, marriage counseling, mental health services for Mother, and budgeting and household financial management.  The record reveals that Mother and Father made efforts to comply with the case plan requirements, but were ultimately unable to make the changes necessary to keep the children in their home.

{¶7}    On September 26, 2017, CCDJFS moved to change protective supervision to emergency custody.  To support its motion, CCDJFS alleged that Mother and Father had not been able to maintain consistent compliance with the agency regarding the cleanliness of their home, parent education, or Mother's mental health.  CCDJFS stated that M.H. and I.H. had been residing with their aunt and uncle, A.S. and M.S., since September 5, 2017, due to safety concerns and to provide Mother and Father with time to clean the home.  CCDJFS reported that most of the floors in Mother and Father's trailer had been reinforced, but that the trailer remained extremely cluttered and infested with bed bugs.  CCDJFS also stated that the current status of the trailer was unacceptable for an exterminator to complete an effective extermination.  Finally, CCDJFS stated that Mother was currently pregnant and due to have her third child, D.H., in nine weeks.  The juvenile court granted CCDJFS's request for temporary custody and set the case for a dispositional hearing.

{¶8}    Following the dispositional hearing, the magistrate continued the temporary custody order.  The juvenile court then adopted the magistrate's disposition decision of

- 3 -

temporary custody on November 6, 2017. D.H. was adjudicated dependent on December 21, 2017, shortly after his birth. Following a dispositional hearing, D.H. was also placed in the temporary custody of CCDJFS.

{¶9} While in the temporary custody of CCDJFS, the children resided with their aunt and uncle, A.S. and M.S., from September 26, 2017, until July 6, 2018, when the family was required to move to Kansas due to M.S.'s military assignment.[1] The children were then placed in a foster home from July 6, 2018, through August 13, 2018. The children's paternal grandmother ("Paternal Grandmother") then had her home study approved and the children were placed in her care from August 13, 2018, until May 28, 2019.

{¶10} On May 28, 2019, Mother and Father regained custody of the children under protective supervision. In August of 2019, Mother and Father were evicted from their trailer. Mother and Father ended their relationship at that point. Father then took the children to live with him and Paternal Grandmother while Mother lived with a friend. On February 25, 2020, Paternal Grandmother stated that Father and the children could no longer stay with her. That same day, Mother and Father agreed to place the children in the temporary custody of CCDJFS. Following their placement with CCDJFS, the children were then placed with a foster family.

{¶11} After being asked to leave Paternal Grandmother's house, Father, now back in a relationship with Mother, was able to pay off the back rent for the lot and moved back into the trailer. Mother and Father continued to reside in the trailer for the remainder of the proceedings. Then, in early 2021, the children's aunt and uncle, A.S. and M.S., returned to Ohio following M.S.'s medical discharge from the military. The children were then placed

---

1. D.H. was placed with A.S. and M.S. on December 4, 2017, following his birth.

back with A.S. and M.S. on January 8, 2021, where they have remained.

{¶12} On January 28, 2021, CCDJFS moved for permanent custody of the children and the matter proceeded to a final hearing on March 5, 2021. At the permanent custody hearing, the state presented evidence that, despite exhaustive efforts by CCDJFS, Mother and Father were unable to provide the children with a clean and safe living environment.

{¶13} The state presented evidence from CCDJFS caseworker, Carla Perla Severini, who documented the procedural history of the case and discussed Mother's and Father's case plans. Severini testified that Mother and Father "checked the box" for many of their case plan services, but failed to improve the conditions that led to the removal of the children. This includes, as Severini testified, the fact that Mother and Father's trailer continues to be unsuitable and unsafe for children; the floors and surfaces were covered in clutter and the hallways were barely passable; dishes were piled up in the sink and on the counter while food and feces littered the floor; and multiple animals lived in the trailer and litter boxes were not routinely changed. Severini testified that fleas and bedbugs were also found in the home on multiple occasions. Throughout the case, Severini stated that she informed Mother and Father about the need to maintain a clean and safe home, but that they would blame one another for the state of the residence. Severini testified that Mother and Father also blamed their inaction as simply being lazy and not wanting to clean.

{¶14} Severini testified that Mother and Father had completed more than 145 parenting classes, but still made no progress in their ability to parent. By comparison, Severini testified that parents are normally scheduled for 15 classes, but that parents could be referred for another 15 classes. More than 30 classes requires a meeting with the agency. Severini also explained that Mother and Father attended 25 sessions of marriage counseling, but that she had observed no change in Mother's and Father's behavior.

Severini further testified that Mother was assessed for mental health issues and attended some therapy, but that Mother ultimately discontinued treatment believing she no longer needed it.

{¶15} As to budgeting, Severini stated that Mother and Father appeared to have enough money, but that they nevertheless always fell behind on bills. This led to the August 2019 eviction. Severini acknowledged that Mother and Father had been consistent with their visitations and that there was a clear bond between them and the children. However, she expressed concern that the ordeal has been confusing and traumatic for the children.

{¶16} As to the children's current placement, Severini testified that the children initially regressed upon being moved back with their aunt and uncle, A.S. and M.S., but that they were now beginning to settle into their routine. By the time of the permanent custody hearing, Severini stated that the children were doing well in their placement and were happy. Severini noted that the children's medical and dental needs were being met by A.S. and M.S. Severini testified that this included M.H. receiving counseling and I.H. receiving medication for her ADHD diagnosis. Severini testified that M.H. and I.H. were also doing well in school and are making friends. Severini further stated that A.S. and M.S. have expressed an interest in adopting the children and will soon complete their training in order to be licensed to adopt.

{¶17} The state then called Sharon Gillespie, a parent educator with Child Focus. Gillespie testified that she worked with Mother and Father for three years, from March 2017 through March 2020. Gillespie confirmed that she completed 145 parenting sessions with Mother and Father, but stated that they made little to no progress. Gillespie testified that despite efforts to educate and assist Mother and Father, their trailer remained filthy and unsuitable. Gillespie testified that she helped Mother and Father create daily checklists of

chores and tried to help the family set up a budget. Gillespie also testified that she was able to locate a local church to help with the trailer's electrical issues.[2] Gillespie testified that she even attempted to help the family relocate since the trailer had so many problems. However, according to Gillespie, Mother and Father never followed through with anything. Gillespie testified that she routinely talked to Mother and Father about the trauma they were inflicting on their children by refusing to clean. Gillespie testified Mother and Father still refused to clean and provide the children with a safe and sanitary residence.

{¶18} Next, the children's aunt, A.S., testified that she intended to adopt the children should that opportunity become available. A.S. testified that she loves the children as her own and that the children refer to her biological children as their brother and sister. A.S. also acknowledged that the children still love Mother and Father, but stated that the children need stability in their lives. A.S. testified that she and her husband, M.S., have sufficient resources to support the children. A.S. further testified that they are currently residing with family, but this arrangement was only temporary, as the family had just returned from Kansas and were in the process of looking to purchase a suitable home.

{¶19} The children's Guardian ad Litem ("GAL") testified and recommended that CCDJFS be granted permanent custody of the children. The GAL testified that Mother and Father never made any improvements on the state of their home. The GAL also noted that Mother and Father's trailer was always filled with clutter and garbage. The GAL testified that the condition of Mother and Father's trailer was so bad that a path needed to be cleared for her to enter, a condition that also prevented an exterminator from dealing with infestations.

---

2. The record indicates that, at one point, Mother's and Father's electric had been disconnected due to an outstanding bill of $4,000.

{¶20} After taking the matter under advisement, the magistrate granted CCDJFS's motion for permanent custody in an entry dated June 16, 2021. Neither Mother nor Father filed timely objections to the magistrate's decision. Then, on July 7, 2021, Mother filed a motion for leave to file objections to the magistrate's decision. Following a hearing, the juvenile court denied Mother's motion for leave to file untimely objections. On August 6, 2021, the juvenile court entered its final judgment entry awarding permanent custody of the children to CCDJFS. Mother now appeals from the juvenile court's decision granting permanent custody of the children to CCDJFS, raising three assignments of error for review.

{¶21} Assignment of Error No. 1:

{¶22} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN FAILING TO GRANT APPELLANT'S MOTION FOR LEAVE TO FILE DELAYED OBJECTIONS.

{¶23} Assignment of Error No. 2:

{¶24} APPELLANT WAS DEPRIVED OF THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO TIMELY FILE OBJECTIONS TO THE MAGISTRATE'S DECISION PERMANENTLY TERMINATING APPELLANT'S PARENTAL RIGHTS.

{¶25} Assignment of Error No. 3:

{¶26} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT IN ADOPTING THE MAGISTRATE'S DECISION PERMANENTLY TERMINATING APPELLANT'S PARENTAL RIGHTS.

{¶27} Because these arguments rely on the same factual foundation, we will analyze all three assignments of error together. In her first assignment of error, Mother argues the juvenile court erred by denying her motion for leave to file untimely objections

to the magistrate's decision. In her second assignment of error, Mother alleges she received ineffective assistance of counsel. Finally, in her third assignment of error, Mother claims the juvenile court erred by adopting the magistrate's decision awarding CCDJFS permanent custody of the children. For the reasons outlined below, we find no merit to any of Mother's three assignments of error.

## Untimely Objections

{¶28} Pursuant to Juv. R. 40(D)(3)(b)(i), "[a] party may file written objections to a magistrate's decision within fourteen days of the filing of the decision, whether or not the court has adopted the decision during that fourteen-day period as permitted by Juv.R. 40(D)(4)(e)(i)." If no timely objections are filed, the court may adopt a magistrate's decision, unless it determines that there is an error of law or other defect evident on the face of the magistrate's decision. Juv.R. 40(D)(4)(c); *In re K.P.R.*, 12th Dist. Warren No. CA2011-03-023, 2011-Ohio-6114, ¶ 7. However, Juv.R. 40(D)(5) permits a reasonable extension of time "[f]or good cause shown." "'Good cause' includes, but is not limited to, a failure by the clerk to timely serve the party seeking the extension with the magistrate's order or decision." *Id.* This court reviews the juvenile court's decision denying a motion for leave to file untimely objections to a magistrate's decision under the abuse of discretion standard. *In re E.B.*, 11th Dist. Lake No. 2013-L-077, 2014-Ohio-5764, ¶ 27.

## Ineffective Assistance of Counsel

{¶29} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re B.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 68; *In re L.J.*, 12th Dist. Warren No. CA2014-10-124, 2015-Ohio-1567, ¶ 33. In determining whether counsel was ineffective in a permanent custody hearing, a reviewing court must apply the two-tier test of

- 9 -

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *In re G.W.*, 12th Dist. Butler No. CA2013-12-246, 2014-Ohio-2579, ¶ 12. That is to say, the parent must show that counsel's performance was outside the wide range of professionally competent assistance and that counsel's deficient performance prejudiced the parent. *In re C.S.*, 12th Dist. Warren No. CA2018-07-080, 2018-Ohio-4786, ¶ 33. To show that a parent was prejudiced by her counsel's deficient performance, the parent must show that there is "a reasonable probability that but for * * * her counsel's alleged errors, the result of the proceedings would have been different." *In re L.J.* at ¶ 33.

**Analysis**

{¶30} In the present case, the magistrate's decision plainly states that objections must be filed within 14 days of the filing of the magistrate's decision. Specifically, in bold letters, the decision states the consequences of not filing timely objections:

> A PARTY SHALL NOT ASSIGN AS ERROR ON APPEAL THE COURT'S ADOPTION OF ANY FACTUAL FINDING OR LEGAL CONCLUSION, WHETHER OR NOT SPECIFICALLY DESIGNATED AS A FINDING OF FACT OR CONCLUSION OF LAW UNDER JUV. R. 40(D)(3)(A)(ii), UNLESS THE PARTY TIMELY AND SPECIFICALLY OBJECTS TO THAT FACTUAL FINDING OR LEGAL CONCLUSION AS REQUIRED BY JUV. R. 40(D)(3)(b).

{¶31} During the hearing on Mother's motion for leave to file her objections to the magistrate's decision untimely, Mother's counsel stated that she met with Mother following the issuance of the magistrate's decision and informed her of the need to file objections within the 14-day period. Mother's counsel stated that she told Mother that Mother should review the decision and report back to her with specific objections. Since Mother did not contact her until July 6, 2021, Mother's counsel stated that she did not timely file objections.

{¶32} Following the hearing, the juvenile court denied Mother's motion for leave to

file untimely objections. In so doing, the juvenile court found that Mother did not provide good cause to permit her untimely objections. The juvenile court found that Mother failed to communicate with her counsel concerning the filing of objections. The juvenile court determined that Mother's failure to communicate represented a disregard for the judicial system and the needs of permanency for the children. The juvenile court also noted that permanency had been delayed long enough and that additional delay "would also be contrary to the policy that juvenile custody issues be resolved expeditiously to allow the child to achieve permanence in a living arrangement." *In re B.T.H.*, 12th Dist. Butler No. CA2017-06-080, 2017-Ohio-8358, ¶ 30.

{¶33} Following review, we find the juvenile court did not abuse its discretion in denying Mother's motion for leave to file untimely objections. As noted above, the magistrate's decision accurately stated the need for timely objections and detailed the consequences of doing not so. Mother's stated reason for the failure to filing objections – an alleged communications issue with her trial counsel – does not rise to the level of "good cause" as required by Juv. R. 40. *See In re D.F.*, 10th Dist. Franklin Nos. 18AP-811 and 18AP-813, 2019-Ohio-3710, ¶ 12. There is nothing in the record that would support Mother's argument that she was prevented from filing timely objections. The record reflects that Mother did not communicate with her trial counsel until after the deadline had passed. Therefore, just as the juvenile court found, any further delay would only delay the achievement of permanency.

{¶34} As to Mother's claim for ineffective assistance of counsel, we find that Mother is unable to show that she was prejudiced by her counsel's alleged deficiency. This is because Mother has failed to establish that there is a reasonable probability that the outcome of the proceedings would have been different given that both parts of the two-part

permanent custody test have been satisfied as discussed in greater detail below.  *In re R.D.*, 12th Dist. Clermont Nos. CA2021-05-017 and CA2021-05-018, 2021-Ohio-3780, ¶ 44 (failure to either element of an ineffective assistance of counsel claim is fatal to the claim).

{¶35}  Pursuant to R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test.  *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9.  First, the juvenile court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D).  *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, pursuant to R.C. 2151.414(B)(1)(a) to (e), the juvenile court must find that any of the following apply: (1) the child is abandoned; (2) the child is orphaned; (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent; or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions.  *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10.

{¶36}  In this case, M.H., I.H., and D.H. have been in the temporary custody of CCDJFS for more than 12 months of a consecutive 22-month period at the time CCDJFS filed its motion for permanent custody.  Therefore, we move to consideration of the best interest factors.  *In re A.W.*, 12th Dist. Fayette No. CA2014-03-005, 2014-Ohio-3188, ¶ 12 ("Only one of [the R.C.2151.414(B)] findings must be met to satisfy the second prong of the two-part permanent custody test").

{¶37} When considering the best interest of a child in a permanent custody hearing, the juvenile court is required under R.C. 2151.414(D)(1) to consider all relevant factors. This includes, but is not limited to, (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-town providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors listed in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and child.

{¶38} Initially, with respect to the children's relevant interactions and relationships with those who may significantly impact their young lives, the record reflects that the children have regularly visited their parents and are bonded with them. The children are also bonded with Paternal Grandmother. However, the children are also well bonded with their foster family, their aunt and uncle, A.S. and M.S. The children resided with A.S. and M.S. from September 2017 until July 2018 when the couple had to relocate due to M.S.'s military assignment. When M.S. was medically discharged, the family returned to Ohio and regained temporary custody of the children in January 2021. The children have remained in A.S.'s and M.S.'s care ever since.

{¶39} During the hearing, A.S. testified that she has had a relationship with the children since they were very young and loves them as her own. A.S. stated that she and M.S. picked D.H. up from the hospital following his birth. The children also get along well with A.S. and M.S.'s two biological children and refer to each other as brothers and sisters. Throughout the pendency of these proceedings, A.S. and M.S. have committed to raising

the children as their own via adoption and are in the process of becoming a licensed to adopt foster home.

{¶40} In considering R.C. 2152.414(D)(1)(c), D.H. is only four years old and was unable to express his wishes in any meaningful way. The GAL reported that the nine-year-old M.H. and the seven-year-old I.H. want to return home with their parents, Mother and Father. The magistrate gave some weight to the wishes of M.H. and I.H. but stated that their wishes may not be an accurate reflection of their best interest in the long-term considering the home, which the magistrate described as "barely habitable, and at best, cluttered, bug ridden and unsanitary."

{¶41} With respect to R.C. 2151.414(D)(1)(c), the children have been in the temporary custody of the agency for 12 or more months of a consecutive 22-month period. More troubling, however, is the repeated uncertainty that the children have faced since September 2016.

{¶42} The children were originally placed in protective supervision while Mother and Father were given time to clean their trailer and provide a safe and sanitary home for their children. After that failed, the agency obtained temporary custody of the children and placed them with their aunt and uncle, A.S. and M.S., until the family was forced to relocate due to M.S.'s military assignment. The children were then placed with their Paternal Grandmother following a brief period with another foster family until they were returned to Mother and Father's care in May 2019. In August 2019, the family was evicted from their trailer and Father and the children went to live with Paternal Grandmother. The children were later returned to CCDJFS' custody on February 25, 2020, and sent to a foster home. A.S. and M.S. then returned to Ohio and have been able to provide a suitable and safe environment for the children ever since.

{¶43} In considering R.C. 2151.414(D)(1)(d), the record reflects that the children need a legally secure placement, that the agency can provide the necessary legally secure placement, and that such placement is the only way the children's needs can be achieved. Despite assistance from the agency and having been given ample opportunities, Mother and Father have demonstrated that they are unable to maintain a safe and appropriate residence for their children. The agency has been involved since September 2016, yet Mother and Father have been unable to provide the children with a safe, stable, consistent environment. Mother and Father have a history of eviction and not being able to pay their bills even with agency assistance. Their trailer was consistently unsanitary and unsafe with multiple infestations of fleas, lice, and bed bugs. The home was so thoroughly cluttered and covered in debris that an exterminator could not treat the residence. Mother and Father were given more than four years to remedy the very serious conditions of their home. Instead of rectifying the problems, Mother and Father blamed each other and relied on excuses that they were just lazy. Despite being repeatedly told that they needed to get their home in order to get their children back, they simply did not take the necessary corrective actions.

{¶44} Based upon its consideration of the R.C. 2151.414(D)(1) factors, the magistrate found by clear and convincing evidence that an award of permanent custody to CCDJFS was in the children's best interest. The juvenile court adopted the magistrate's decision finding no error on the face of the decision. Now, on appeal, Mother argues that the decision awarding permanent custody was not supported by clear and convincing evidence. To support this claim, Mother argues the children had adequate food and clothing and there was no evidence that the children had been harmed by the condition of the home. Mother also alleges that she completed many of the case plan requirements, that she and

the children are well bonded, and that the children's placement with their aunt and uncle, A.S. and M.S., is not in their best interest.

{¶45} However, after carefully and thoroughly reviewing the record in this case, we find the state presented clear and convincing evidence that the best interest of the children is served by granting permanent custody to CCDJFS. Though Mother completed some case plan requirements, it is well established that the completion of certain case plan requirements does not preclude a grant of permanent custody. *In re Mraz*, 12th Dist. Brown Nos. CA2002-05-011 and CA2002-07-014, 2002-Ohio-7278, ¶ 13; *In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 35 ("case plan is merely a means to a goal and not a goal in itself").

{¶46} In the present case, Mother cannot provide the children with a clean and safe environment or provide for their basic needs. As this court has previously stated, parents are "afforded a reasonable, not an indefinite, period of time to remedy the conditions causing the children's removal." *In re C.M.*, 12th Dist. Clermont No. CA2016-07-051, 2017-Ohio-57, ¶ 26. Mother has been given ample opportunities to rectify the situation but has been unable or unwilling to correct the deplorable, unsanitary, and dangerous condition of their home. *See, e.g., In re B.S.*, 12th Dist. Fayette Nos. CA2018-06-011 and CA2018-06-012, 2018-Ohio-4385, ¶ 23 (permanent custody awarded because of failure to provide a clean and safe environment). The record reflects that the children need a legally secure placement and Mother has demonstrated that she cannot maintain a safe and appropriate residence for them. To the contrary, the children have received appropriate care and are bonded with their aunt and uncle, A.S. and M.S.

{¶47} In light of the foregoing, we find the juvenile court's decision was supported by the evidence and find no error in the juvenile court's decision to grant permanent custody

to CCDJFS. The children have been in the temporary custody of the agency for 12 months of a consecutive 22-month period and the grant of permanent custody to CCDJFS is in their best interest. Furthermore, Mother cannot demonstrate any prejudice as to the juvenile court's denial of her motion for untimely objections or for her counsel's actions in failing to file timely objection. As a result, we find Mother's three assignments of error are without merit and are overruled.

{¶48} Judgment affirmed.

PIPER, P.J., and S. POWELL, J., concur.